**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | | |
|---|---|---|
| **CAG FOOD SERVICES, LLC, f/k/a** | ) | |
| **CORRECTIONAL ADVISOR'S** | ) | |
| **GROUP,** | ) | |
| **LLC,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No.** |
| | ) | **1:18-cv-02753-RWS** |
| **v.** | ) | |
| | ) | |
| **SHAVER FOODS, LLC,** | ) | |
| | ) | |
| **Defendant.** | | |

**BRIEF IN SUPPORT OF DEFENDANT SHAVER FOODS, LLC'S
MOTION TO DISMISS COUNTS II, III, IV, V, AND VI OF THE
VERIFIED COMPLAINT**

Defendant Shaver Foods, LLC ("Shaver") hereby files this Brief in Support of its Motion to Dismiss Counts II, III, IV, V and VI of the Verified Complaint, respectfully showing the Court as follows:

## I.     **Introduction**

This is contract dispute.  Plaintiff CAG Food Services, LLC f/k/a Correctional Advisor's Group, LLC ("CAG" or "Plaintiff") claims Shaver is in breach of a "Supply Agreement" between the parties for the provisioning of food and food related products.   A true and correct copy of the Supply Agreement is

attached hereto as **Exhibit A**.[1]

Counts II through VI of the Verified Complaint fail to state valid claims for which relief can be granted and should be dismissed.

## II.      Statement of Relevant Facts

Taking as true for the purposes of this motion only the allegations of Plaintiff's Verified Complaint, the relevant facts are as follows:

Plaintiff is in the business of providing food and food-related products to clients throughout the United States.   See Verified Complaint at ¶ 6.  Many of these clients are correctional facilities, including county jails.  Id

Plaintiff and Shaver are parties to a Supply Agreement (see **Exhibit A**).  See

---

[1]      Plaintiff attached an incomplete copy of the Supply Agreement to its Verified Complaint (it provided only the first page of the agreement).  **Exhibit A** is the fully executed copy, which is not outside the pleadings for the purposes of this Motion.  "A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."  Fed. R. Civ. P. 10(c); see also Day v. Taylor, 400 F.3d 1272, 1276 (11th Cir.2005) (citation omitted) (district court "may consider a document attached to a motion to dismiss without converting the motion into one for summary judgment if the attached document is (1) central to the plaintiff's claim and (2) undisputed"); SFM Holdings, Ltd. V. Banc of America Securities, LLC, 600 F.3d 1334, 1337 (11th Cir. 2010) (same); In Re: Burlington Coat Factory Sec. Litig., 114 F.3d 1410 (3rd Cir. 1997) (a court can consider documents "integral to or explicitly relied upon in the complaint"); In Re: Rockefeller, 184 F.3d 280, 287 (3rd Cir. 1999)(court may consider "undisputedly authentic" documents attached as an exhibit as a motion to dismiss if the opposing party's claims are based on those document).

Verified Complaint at ¶ 10.[2]  According to Plaintiff, under the Supply Agreement, Shaver "would provide food and food-related products to Plaintiff's clients[3] and in return, among other obligations, would pay a commission for procuring these orders."  Id.

Central to Plaintiff's claims is the following non-solicitation provision set forth in the Supply Agreement:

> SHAVER FOODS, LLC intends to protect the relationship [Plaintiff] has with its clients, and, in exchange for our role as the primary supplier to their clients, will not solicit nor entertain solicitations from clients of [Plaintiff] for SHAVER FOODS, LLC to supply the clients directly.  If approached by a client to provide such, SHAVER FOODS, LLC shall inform the client that they are handled through [Plaintiff] and shall, within 48 hours, notify [Plaintiff] of the solicitation and client making it."

See Supply Agreement at 1.  This provision is not limited by duration or to a specific geographic scope.

By its express terms, the Supply Agreement applies only to certain specified

---

[2]      Although Plaintiff states the Supply Agreement was entered into "[o]n or about June 26, 2008" (see Verified Complaint at 10), the signature page of the Supply Agreement indicates that it was executed in 2007.

[3]      Shaver disputes the Verified Complaint's characterization of the relationship and food delivery arrangements between Shaver, Plaintiff, and the ultimate consumer.  But even taking as true Plaintiff's allegation that every recipient of Shaver's food product was Plaintiff's "client," Counts II through VI fail to state claims for which relief can be granted.

entities that Plaintiff claims as its "clients."[4]  Exhibit A to the Supply Agreement (which was omitted from the incomplete copy of the Supply Agreement attached to the Verified Complaint) lists six clients, none of whom are located in the State of Georgia.

The Supply Agreement does not have a specified term.  Shaver Foods terminated the Supply Agreement on or about May 2, 2018.  See Verified Complaint at 17.  Thereafter, Plaintiff alleges that Shaver acted improperly by "cutting Plaintiff off from its clients and attempting to supply Plaintiff's clients directly."  Id. at 32.  These core facts form the ostensible basis for Plaintiff's claims for (i) alleged breach of the non-solicitation provision (Count II); (ii) alleged tortious interference with contract and business relations (Count III); (iii) alleged violation of the implied covenant of good faith and fair dealing (Count IV); and (iv) injunctive relief (Count V).[5]  Plaintiff also asserts a claim for punitive

---

[4]    See Supply Agreement at 2 ("This agreement will be modified from time to time to add or remove clients of CORRECTIONAL ADVISOR'S GROUP, LLC covered under this agreement (Attachment A) with the date of such change included in the amendment.").

[5]    Counts II, IV, and V should be dismissed outright because they depend on a non-solicitation provision which is impermissibly overbroad in terms of duration and geographic scope.  But even if these counts survive a motion to dismiss, Plaintiff nonetheless has failed to satisfy the standards necessary to support a preliminary injunction.  This discussion is set forth in Shaver's Opposition to Plaintiff's Motion for Emergency Hearing and Injunctive Relief, which Shaver will file on or before June 26, 2018.

damages (Count VI).

### III.    Argument and Citation to legal authority

### A.    Motion to Dismiss Standard

On a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, the trial court should "assume that the factual allegations in the complaint are true and give the plaintiff[] the benefit of reasonable factual inferences."  Wooten v. Quicken Loans, Inc., 626 F.3d 1187, 1196 (11th Cir. 2010).  Although reasonable inferences are made in the plaintiff's favor, "'unwarranted deductions of fact' are not admitted as true in a motion to dismiss."  Aldana v. Del Monte Fresh Produce, N.A., 416 F.3d 1242, 1248 (11th Cir. 2005) (quoting S. Fla. Water Mgmt. Dist. v. Montalvo, 84 F.3d 402, 408 n.10 (1996)).  The court is not required to accept conclusory allegations and legal conclusions as true.  See Am. Dental Ass'n v. Cigna Corp., 605 F.3d 1283, 1290 (11th Cir. 2010) (construing Ashcroft v. Iqbal, 556 U.S. 662 (2009); Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007)).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 570)).  Mere "labels and conclusions" are insufficient.  Twombly, 550 U.S. at 555.  "A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556).  This requires more than the "mere possibility of misconduct." Am. Dental, 605 F.3d at 1290 (quoting Iqbal, 556 U.S. at 679).  The well-pled allegations must "nudge[] their claims across the line from conceivable to plausible." Id. at 1289 (quoting Twombly, 550 U.S. at 570).

Counts II through VI do not meet these standards and should be dismissed accordingly.

**B.    Georgia Law Applies**

As a threshold matter, Georgia law applies to this dispute.  Federal courts sitting in diversity must apply the forum state's choice-of-law principles. Fed. Rural Elec. Ins. Exch. v. R.D. Moody & Assocs., Inc., 468 F.3d 1322, 1325 (11th Cir. 2006).  Under the Georgia rule of *lex loci contractus*, "the validity, nature, construction, and interpretation of a contract are governed by the substantive law of the state where the contract was made, except that where the contract is made in one state and is to be performed in another state, the substantive law of the state where the contract is performed will apply." Id. (citations omitted).  But, Georgia's choice of law rules are subject to an exception: "[w]here the application

of foreign law (whether another state or another country) contravenes Georgia public policy, the court need not apply the foreign law." McCarthy v. Yamaha Motor Manufacturing Corp., 994 F. Supp. 2d 1329, 1332 (N.D. Ga. 2014) (citing Bailey v. Cottrell, Inc., 313 Ga. App. 371, 721 S.E.2d 571, 573 (2011)).

In the present case, Plaintiff's Verified Complaint arguably lacks sufficient factual detail to determine where the Supply Agreement was made or was to be performed for purposes of a *lex loci contractus* analysis.  But the Court need not resolve (or attempt to resolve) that issue because Counts II, IV and V of Plaintiff's Verified Complaint seek to enforce a non-solicitation provision, thus implicating important public policy considerations and, consequently, triggering the application of Georgia law.  "Covenants against disclosure, like covenants against competition, affect the interests of this state, namely the flow of information needed for competition among businesses, and hence their validity is determined by the public policy of this state." Convergys Corp. v. Keener, 582 S.E.2d 84, 85-86 (Ga. 2003)(quoting Nasco, Inc. v. Gimbert, 238 S.E.2d 368, 369 (Ga. 1977)). Thus, Georgia law applies to Counts II, IV and V of the Verified Complaint.

With respect to Plaintiff's tortious interference claim (Count III):

choice-of-law issues in tort cases are governed by  the rule of *lex loci delicti,* which requires application of the substantive law  of  the  place where  the  tort  or  wrong  occurred.   The  place  of  wrong, the *locus delicti,* is the place where the injury sustained was suffered rather than

> the   place where the act was committed, or . . . it is the place where
> the last event necessary to make an actor liable for an alleged tort
> takes place.
>
> But Georgia's choice-of-law rules limit the application of another
> jurisdiction's laws to statutes and decisions construing those statutes,
> even for tort claims. Consequently, when no statute is involved,
> Georgia courts apply the common law as developed in Georgia rather
> than foreign case law.

McCarthy, 94 F. Supp. 2d at 1332 (quotations, citations, and alterations omitted).

See also Kirkpatrick v. J.C. Bradford & Co., 827 F.2d 718, 725 n. 6 (11th Cir.1987)

("If a particular state does not have a controlling statute, however, the Georgia

choice of law rule requires application of the common law as construed by the

courts of Georgia."); In re Tri-State Crematory Litigation, 215 F.R.D. 660, 677

(N.D. Ga. 2003) ("Georgia's choice of law system, however, has an unusual

characteristic: the application of another jurisdiction's laws is limited to statutes

and decisions construing those statutes. When no statute is involved, Georgia

courts apply the common law as developed in Georgia rather than foreign case law."

(quotations and citations omitted)).

Here, Plaintiff's tortious interference claims are based on common law.  And,

as set forth above, Georgia's choice-of-law rules eschew the application of another

state's common law.  Thus, Georgia law applies to Plaintiff's tortious interference

claims.

**C.**     **Counts II (Breach of Non-Solicit), IV (Covenant of Good Faith and Fair Dealing) and V (Injunctive Relief) Should be Dismissed**

Counts II, IV, and V seek to enforce the non-solicitation provision of the Supply Agreement and thus hinge on the enforceability of that provision.  The non-solicitation provision is unenforceable for at least the following reasons: (1) as written, it does not extend beyond the life of the Supply Agreement, which has already been terminated; (2) it does not include any geographic restrictions and is unlimited in duration and is thus void and unenforceable under Georgia law; and (3) the "non-acceptance" clause included within the non-solicitation provision is unenforceable as a matter of Georgia law.

1.     **The Non-Solicitation Provision Does Not Cover Post-Termination Activity.**

The non-solicitation provision does not survive the termination of the Supply Agreement.  Again, the non-solicitation provision provides:

> SHAVER FOODS, LLC intends to protect the relationship CORRECTIONAL ADVISOR'S GROUP, LLC has with its clients, and, in exchange for our role as the primary supplier to their clients, will not solicit nor entertain solicitations from clients of CORRECTIONAL ADVISOR'S GROUP, LLC for SHAVER FOODS, LLC to supply the clients directly.  If approached by a client to provide such, SHAVER FOODS, LLC shall inform the client that they are handled through CORRECTIONAL ADVISOR'S GROUP, LLC and shall, within 48 business hours, notify CORRECTIONAL ADVISOR'S GROUP, LLC of the solicitation and the client making it.

<u>See</u> **Exhibit A** at 1.  Importantly, there is no language anywhere in the Supply Agreement extending the non-solicitation provision beyond the term of the agreement.

Because the Supply Agreement was for an indefinite term, it was terminable at will by either party.  <u>See</u>, <u>e.g</u>, <u>Lederle v. City of Atl.</u>, 164 Ga. App. 440 (1927) (contract that continues indefinitely is terminable at will); <u>Jones v. Destiny Indus.</u>, 226 Ga. App. 6, 8 (1997)(same).  CAG admits that Shaver Foods did in fact terminate the Supply Agreement on May 2, 2018.  <u>See</u> Verified Complaint at ¶ 17. Thus, because there is no language in the Supply Agreement specifying to the contrary, the termination of the Supply Agreement necessarily terminated the non-solicitation provision.  The termination of the non-solicit provision defeats Counts II, IV and V.

## 2.    The Non-Solicitation Provision Is Unenforceable As A Matter Of Law.

As a separate and independently sufficient basis for dismissing Counts II, IV and V, the non-solicitation provision is void and unenforceable as written.  If the provision is construed to prevent future solicitations (<u>i.e.</u>, if it purports to prevent Shaver from soliciting certain clients even after the agreement is terminated), the provision lacks a time limit and therefore would prevent Shaver from soliciting clients in perpetuity.  Moreover, the non-solicitation provision does not limit its

application to clients Shaver actually interacted with as a result of the Supply Agreement, nor does it contain any territorial limitation.   Thus, if the non-solicitation provision were applied prospectively in the manner Plaintiff apparently proposes, it would literally prevent Shaver from soliciting any CAG client (whether or not Shaver had a preexisting relationship with them), anywhere in the world, and from now until the end of time.   Such a limitless restrictive covenant is void and unenforceable under Georgia law.   Advance Technology Consultants, Inc. v. Roadtrac, LLC, 250 Ga. App. 317, 320-321 (2001) (non-solicitation agreement void because it contained no territorial restriction); Carson v. Obor Holding Co., 318 Ga. App. 645, 649-50 (2012) (same); Paramount Tax & Accounting, LLC v. H&R Block Enters., Inc., 299 Ga. App. 596 (2009); Cox v. Altus Healthcare and Hospice, Inc., 308 Ga. App. 28, 31 (2011) (non-solicitation provision with no time limit is unenforceable); Trujillo v. Great Southern Equip. Sales, LLC, 289 Ga. App. 474, 476 (2008) (restrictive covenants must be "strictly limited" as to time, territorial effect, and scope).

It is true that in 2011, the General Assembly modified the common law concerning restrictive covenants by passing the Georgia Restrictive Covenants Act (the "Act"), O.C.G.A. § 13-8-50 et seq., to allow a court to "blue pencil" otherwise void restrictive covenants by modifying the covenants to limit their scope.   See,

11

e.g., O.C.G.A. § 13-8-54.  But the blue pencil cannot save Plaintiff's claims here. First, the Supply Agreement is dated in 2007, and Georgia courts have repeatedly affirmed that the older common law on restrictive covenants applies to agreements entered into prior to May 11, 2011, when the Act was enacted.  Lapolla Indus., Inc. v. Hess, 325 Ga. App. 256, 265-66 (2013); Burson v. Milton Hall Surgical Assocs., LLC, 343 Ga. App. 159, 160-161 (2017) (quoting Ga. L. 2011, p. 399, §§ 4-6, and noting that the Act "shall not apply in actions determining the enforceability of restrictive covenants entered into before [May 11, 2011]").  Therefore, the older Georgia common law applies to the Supply Agreement, which would hold the non-solicitation provision unenforceable even if it was intended to apply post-termination.  Pregler v. C&Z, Inc., 259 Ga. App. 149, 150-151 (2003) ("Georgia law is clear that if one [restrictive covenant] is unenforceable, they are all unenforceable. . . .   Georgia does not employ the 'blue pencil' doctrine of severability.").

Moreover, even if the Act applied to the Supply Agreement—and it does not—the non-solicitation provision is still unenforceable.  A blue pencil may be able to strike offensive or overbroad provisions, but it cannot create geographic and time restrictions where none exist.  See LifeBrite Labs v. Cooksey, No. 1:15-cv-4309, 2016 WL 7840217, at *7 (N.D. Ga. Dec. 9, 2016)("Though courts may

strike unreasonable restrictions, and may narrow over-broad territorial designations, courts may not completely reform and rewrite contracts by supplying new and material terms from whole cloth.").  In LifeBrite, this Court refused to enforce a restrictive covenant that lacked any geographic limitations, holding that it could narrow an unreasonable geographic limitation, but it could not invent a geographic restriction where none existed.  Id. at *6-*7.

So too in this case.  The non-solicitation provision does not even attempt to set geographic or time limitations and therefore cannot be saved by blue penciling. Whether the old common law or the Act applies, the outcome is the same: the non-solicitation provision Plaintiff seeks to enforce is unenforceable as a matter of law.

3.  **The Non-Solicitation Provision is Unenforceable Insofar as it Includes a "Non-Acceptance" Prohibition**.

In addition to the problems with the non-solicitation provision as set forth above, the provision is also unenforceable insofar as it purports to prohibit Shaver from soliciting or "entertain[ing] solicitations" from clients.  These types of "non-acceptance" provisions are unenforceable under Georgia law.  See, e.g., Waldeck v. Curtis 1000, Inc., 261 Ga. App. 590, 591-592 (2003)(" … a non-solicitation provision may not contain a bar on the acceptance of business from unsolicited clients"); see also Fine v. Commc'n Trends, Inc., 305 Ga. App. 298 (2010).  In no event can Shaver be prohibited from accepting business it does not solicit (i.e.,

business initiated by the customer).  And, because this provision cannot be saved by blue penciling (again, because the Act does not apply to contracts entered into before 2011), this impermissible "non-acceptance" provision renders the entire non-solicitation provision unenforceable.

For all of these reasons, the non-solicitation provision Plaintiff seeks to enforce is unenforceable as a matter of law.  Accordingly, Counts II, IV,[6] and V, which depend on the enforceability of the non-solicitation provision, should be dismissed.

### D.    Count III (Tortious Interference Claims) Should be Dismissed

To prevail on a claim of tortious interference with contractual relations, a claimant must show: (1) improper action or wrongful conduct by the defendant without privilege; (2) purposeful or malicious action with intent to injure by the defendant; (3) the inducement of a breach of contractual obligation; and (4) the tortious conduct proximately caused the claimant's alleged injuries.  Disaster

---

[6]    Because the duty of good faith and fair dealing is not a standalone claim, Plaintiff must adequately plead a breach of the explicit terms of the agreement to withstand a motion to dismiss on Count IV.  Alan's of Atlanta, Inc. v. Minolta Corp., 903 F.2d 1414, 1429 (11th Cir. 1990); Stuart Enters. Int'l, Inc. v. Peykan, Inc., 252 Ga. App. 231, 233 (2001) ("[Plaintiff's] claim of a breach of the covenant of good faith and fair dealing is not an independent cause of action which could be asserted separately from the claim for breach of contract.").  Because Count IV depends on the non-solicitation provision, which is unenforceable, Count IV should be dismissed.

Servs., Inc. v. ERC P'ship, 228 Ga. App. 739, 740 (1997).  Similarly, to prevail on a claim of tortious interference with business relations, a claimant must show: (1) the defendant acted improperly and without privilege, (2) purposely and with malice with the intent to injure, (3) induced a third party or parties not to enter into or continue a business relationship with the claimant, and (4) for which the claimant suffered financial injury. American Southern Ins. Group, Inc. v. Goldstein, 291 Ga. App. 1, 11 (2008).[7]

Importantly, a claim will not lie where the alleged tortfeasor is not a "stranger" to the relationship.  Brilliant Alternatives, 2012 WL 1600411, at * 5.

> Under Georgia law, a defendant is not a stranger as a matter of law when "(1) the defendant is an essential entity to the purported injured relations; (2) the alleged injured relations are inextricably a part of or dependent upon the defendant's contractual or business relations; (3) the defendant would benefit economically from the alleged injured relations; or (4) both the defendant and the plaintiff are parties to a comprehensive interwoven set of contracts or relations."

Id. (quoting Britt/Paulk, Inc. Agency, Inc. v. Vandroff Ins. Agency, Inc., 952 F. Supp. 1575, 1581 (N.D. Ga. 1991)).  "In order to be liable for interference with a contract, a defendant must be both a stranger to the contract *and the business*

---

[7]    While tortious interference with contractual relations and tortious interference with business relations are two distinct torts, the two claims share common elements. Brilliant Alternatives, Inc. v. Feed Management Systems, Inc., No. 1:09-CV-2348-RWS, 2012 WL 1600411, at * 5 (N.D. Ga. May 7, 2012).

*relationship giving rise to and underlining the contract*." <u>Pruitt Corp. v. Strahley</u>,

270 Ga. 430, 431 (1999) (emphasis added).

> Georgia law further instructs as follows:
>
> where a defendant had a legitimate interest in either the contract or a party to the contract, he is not a stranger to the contract itself or to the business relationship giving rise thereto and underpinning the contract. Nor does the fact that a defendant did not sign the contract preclude a finding that he was no stranger to the contract.

<u>Stefano Arts v. Sui</u>, 301 Ga. App. 857, 862 (2010); <u>see</u> <u>also</u> <u>BKJB P'ship v.</u>

<u>Moseman</u>, 284 Ga. App. 862, 866 (2007) ("The law is clear that all parties to an

interwoven contractual arrangement are not liable for tortious interference with any

of the contracts or business relationships.") (internal citations and quotations

omitted).

Of particular relevance to this case, a supplier has a legitimate interest in the

business relationship between a middleperson and an end consumer when the

supplier's role supports the relationship between the middleperson and end

consumer.  <u>See</u>, <u>e.g.</u>, <u>Stefano Arts v. Sui</u>, 301 Ga. App. 857, 690 S.E.2d 197

(2010).  In <u>Stefano Arts</u>, a supplier (the defendant) was accused of improperly

selling directly to the ultimate consumer, thereby cutting a consultant (who had put

the supplier and consumer together in the first place) "out of the loop."  The

consultant sued the supplier for tortious interference with contract.  The Court of

Appeals held that the supplier was "intimately involved" in the relationship between the consultant and the consumer because it "was the basis for the business and contractual relationship" between them. 301 Ga. App. at 863.   Thus, the supplier was not a stranger to the relationship.  Id.

Likewise, in the present case, Shaver is not a stranger to the contracts and relationships placed at issue in Count III.  Taking as true the allegations of the Verified Complaint, Shaver was the primary supplier to Plaintiff's clients but improperly cut Plaintiff out of the arrangement.  In other words, according to Plaintiff, Shaver acted improperly by seizing control of certain contracts and relationships – interwoven contracts and relationships that Shaver had an economic stake in and was already in the center of.  Indeed, under the Supply Agreement, the client would buy directly from Shaver and Shaver would, in turn, pay a commission to Plaintiff.[8]  Shaver was thus not a stranger to the contracts and relationships in question.

Finally, Plaintiff's problem with the stranger doctrine aside, Plaintiff fails to allege any wrongful (much less malicious) conduct to support a tortious interference claim.  Again, the gist of Plaintiff's Verified Complaint is that Shaver

---

[8]    See Supply Agreement at 1 ("The party (herafter buyer) purchasing the food and food related products shall be the client of CORRECTIONAL ADVISOR'S GROUP, LLC, not CORECTIONAL ADVISOR'S GROUP, LLC itself.").

has breached the non-solicitation provision of the Supply Agreement by dealing directly with certain clients after terminating the Supply Agreement.  But the non-solicitation provision is unenforceable, and Plaintiff has not alleged any non-conclusory facts describing otherwise improper conduct on the part of Shaver.  Count III fails to state a claim for which relief can be granted and should be dismissed accordingly.

**E.**     **Count VI (Punitive Damages) Should be Dismissed**

"It is well settled that punitive damages are not available in breach of contract claims."  ServiceMaster Co., L.P. v. Martin, 252 Ga. App. 751, 757 (2001); see also Benefit Support, Inc. v. Hall County, 281 Ga. App. 825, 637 S.E.2d 763 (2006)(punitive damages not recoverable where claimant could not recover on its underlying tort claims).  As outlined above, Plaintiff fails to state actionable tort claims.   Thus, Plaintiff's request for punitive damages (Count VI) should be dismissed as well.

**IV.     Conclusion**

For the foregoing reasons, the Court should dismiss Counts II through VI of the Verified Complaint.

Respectfully submitted this 19th day of June, 2018.

/s/ Matthew B. Ames
Matthew B. Ames
Georgia Bar Number 015898
mames@balch.com
James Williams, Jr.
Georgia Bar No. 812411
jwilliams@balch.com

BALCH & BINGHAM LLP
30 Ivan Allen Jr. Boulevard, NW
Suite 700
Atlanta, Georgia 30309
T: (404) 261-6020
F: (404) 261-3756

*Attorneys for Defendant Shaver
Foods, LLC*

## CERTIFICATE OF FONT SIZE

Counsel certifies that the foregoing *Defendant's Brief in Support of Motion to Dismiss Counts II, III, IV, V, and VI of the Verified Complaint* has been prepared using Times New Roman font size 14 in accordance with Local Rule 7.1(D).

This 19th day of June, 2018.

/s/ Matthew B. Ames
Matthew B. Ames
Georgia Bar Number 015898

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 19, 2018, I filed a copy of Brief In Support Of Defendant Shaver Food, LLC's Motion to Dismiss Counts II, III, IV, V, and VI of The Verified Complaint with the Clerk of the Court via the CM/ECF system, which will automatically notify and serve all counsel of record.

*/s/ Matthew B. Ames*
Matthew B. Ames
Georgia Bar Number 015898