## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | | |
|---|---|---|
| **CAG FOOD SERVICES, LLC, f/k/a CORRECTIONAL ADVISOR'S GROUP, LLC,** | ) ) ) ) ) | |
| **Plaintiff,** | ) ) | **Civil Action No.** **1:18-cv-02753-RWS** |
| **v.** | ) ) | |
| **SHAVER FOODS, LLC,** | ) ) | |
| **Defendant.** | ) | |

## DEFENDANT'S INITIAL DISCLOSURES

Pursuant to Federal Rule of Civil Procedure 26(a)(1) and Local Rule 26.1, Defendant Shaver Foods, LLC ("Shaver") discloses the following based on currently available information. The numbered paragraphs below are styled in accordance with Appendix B to the Local Rules for the Northern District of Georgia. Shaver reserves the right to amend these disclosures as additional facts become known to it related to this litigation.

**(1) If the defendant is improperly identified, state defendant's correct identification and state whether defendant will accept service of an amended summons and complaint reflecting the information furnished in this disclosure response.**

Shaver is properly identified.

276506.1

**(2) Provide the names of any parties whom defendant contends are necessary parties to this action, but who have not been named by plaintiff. If defendant contends that there is a question of misjoinder of parties, provide the reasons for defendant's contention.**

None.

**(3) Provide a detailed factual basis for the defense or defenses and any counterclaims or crossclaims asserted by defendant in the responsive pleading.**

<u>**Factual grounds for defenses:**</u>

Shaver is in the business of low cost institutional food distribution. Among other things, Shaver markets, sells, procures, stores, consolidates and ships food and food related products to correctional facilities throughout the United States. Shaver has been in this business since 1950.

CAG was formed in 2007. It is owned by two individuals, Rich Adams and William T. ("W.T.") Ross. Prior to starting CAG in 2007, Mr. Adams and Mr. Ross worked at Compass Group North America, an organization in the food management industry. Mr. Adams and Mr. Ross were both customers of Shaver Foods, LLC when they were part of Compass Group North America.

Messrs. Adams and Ross claimed that, through their ostensible business contacts in the food service industry, they could help Shaver increase its customer base and create new sales opportunities. At the time CAG and Shaver entered into

the "Original Supply Agreement" referenced in the Complaint, CAG did not have any written contracts with any customers that relate to the provisioning of food product.[1]   Stated differently: at the time that CAG and Shaver entered into the Original Supply Agreement, there were no <u>existing</u> food-supply contracts between CAG and other third-parties.

Thus, the relationship was based not on existing "contracts" (because few, if any, existed), but rather on CAG's promise that it could grow Shaver Foods business by using CAG's contacts and acting in a sales, customer service and support role for the existing Shaver Foods product and distribution model.

It is against this backdrop that CAG and Shaver negotiated and entered into the Original Supply Agreement on or about August 1, 2007.  The aim was for CAG to bring long-term food contracts to Shaver.  Thus, the references to "CAG clients" in the Original Supply Agreement referred to client contracts that CAG claimed it could bring to Shaver – not to client contracts that were already in place between Shaver and third-parties (again, because no such written contracts existed).

Under the Original Supply Agreement, Shaver agreed to pay CAG 5% of the total amount paid for each future invoice by a client managed by CAG "within the

---

[1]     A possible exception could be Avalon Correctional Services mentioned in Attachment A of the "Original Supply Agreement", although Shaver Foods was not aware of any written contracts between CAG and Avalon Correctional Services at the time

purview of the agreement."   But under the terms of the Original Supply Agreement, the amount of the commission to be paid to CAG could be adjusted by the agreement of the parties, as the business circumstances required.   To earn a sales commission payment of any kind, CAG had to provide a service of value to Shaver – it needed to assist with the customer sale, accurately communicate the terms of the sale back to Shaver, and thereafter provide customer support and service.

On or about July 30, 2008, Shaver and CAG entered into the Amended Supply Agreement.   Both CAG and Shaver participated in the drafting of the Amended Supply Agreement.   And like the Original Supply Agreement, the Amended Supply Agreement does not contain a specified term and it is thus terminable at the will of either party (at no time did CAG suggest or request that the parties enter into a time-bound agreement, as opposed to an at-will arrangement).

Like the Original Supply Agreement, the Amended Supply Agreement presented CAG with the opportunity to earn a 5 % commission based as a percentage of customer-paid invoices "within the purview of this supply agreement."  But also like the Original Supply Agreement, under the terms of the Amended Supply Agreement, the amount of the commission to be paid to CAG

could be adjusted by the agreement of the parties, as the business circumstances required.

Also like the Original Supply Agreement, the Amended Supply Agreement required CAG to provide a service of value to Shaver to be eligible to receive a commission. Again, CAG was expected to (and required to) add value by assisting with sales, communicating the terms of the sale back to Shaver, and thereafter providing customer service.

The Amended Supply Agreement contains the following provision:

> SHAVER FOODS, LLC intends to protect the relationship [Plaintiff] has with its clients, and, in exchange for our role as the primary supplier to their clients, will not solicit nor entertain solicitations from clients of [Plaintiff] for SHAVER FOODS, LLC to supply the clients directly. If approached by a client to provide such, SHAVER FOODS, LLC shall inform the client that they are handled through [Plaintiff] and shall, within 48 hours, notify [Plaintiff] of the solicitation and client making it."

See Amended Supply Agreement at 1 (hereinafter, the "Non-Compete provision.").

 The Non-Compete provision is overbroad and unenforceable under Georgia law.

Under the Amended Supply Agreement, it was particularly important that the terms of a sales order placed by a customer were fully and accurately communicated by Plaintiff to Shaver. The low cost institutional food distribution industry is highly competitive and labor intensive. The margins are thin -- and they are shrinking over time. An error by CAG in communicating the terms of a

5

customer's order to Shaver could result in the profits from that order being eroded, along with the possible loss of customers and damage to Shaver's goodwill. Such errors would also cause Shaver a significant loss in employee time and productivity.

### CAG's DECLINING PERFORMANCE UNDER THE AMENDED SUPPLY AGREEMENT

From 2008 (when the Amended Supply Agreement was executed) through May 2018 (when it was terminated), Shaver paid CAG commissions in an appropriate amount each and every month with very rare exception.[2]   Shaver would also send CAG an electronic table showing the supporting calculations.

CAG voluntarily accepted every commissions payment made by Shaver without protest. At no time prior to the termination of the Amended Supply Agreement did CAG ever send Shaver a "notice of default" or other similar-type correspondence declaring Shaver to be in breach of the agreement. And at no time prior to Shaver's termination of the Amended Supply Agreement did CAG ever take the position that Shaver was "shortchanging" commissions or otherwise in breach of the Amended Supply Agreement.

---

[2]   On the rare occasions where Shaver may have made an inadvertent error or CAG was sent a commission lower than agreed-to (and CAG brought the matter to Shaver's attention), Shaver corrected the amount.

6

Although one of the main business drivers underlying the Original Supply Agreement and the Amended Supply Agreement was CAG's promise that it would procure long-term food supply contracts for Shaver to fulfill, CAG did not succeed in this mission.   In the roughly ten (10) years after the Amended Supply Agreement was executed, CAG brought few – if any – such contracts to Shaver. To the extent CAG added any value to Shaver over the years following the execution of the Amended Supply Agreement, it was essentially to assist with the servicing of Shaver's already-existing customer base.

Over time in the years that followed the execution of the Amended Supply Agreement, the "value" CAG provided to Shaver (if any) diminished.  CAG did not succeed in bringing long-term contracts to Shaver.  On more than one occasion since March 2016, Shaver advised CAG that the business arrangement between them was not working and could need to be reconsidered if circumstances did not improve.   Because the Amended Supply Agreement was at-will, Shaver had every right to reconsider its relationship with CAG.

Meanwhile, in 2017, CAG participated in the placement of an order by an important Shaver customer known as Elior.  In reporting this news back to Shaver, CAG misstated the terms of the order placed by Elior.   As a consequence of CAG's reporting error, Shaver was blindsided by a demand for a "rebate" by Elior

that Shaver was not expecting and did not believe it had agreed to extend.  Shaver

eventually had to make payments to Elior totaling $496,953.91 to resolve this error

by CAG.

Also, because of CAG's error in reporting the terms of Elior's food order

back to Shaver, Shaver suffered a substantial loss in employee productivity and

time in trying to understand and rectify the error.

**Factual grounds for counterclaims**:

As stated above, under the Amended Supply Agreement, CAG was required

to provide a service of value to Shaver – it needed to assist with the customer sale,

accurately communicate the terms of the sale back to Shaver, and thereafter

provide customer service.

CAG failed to consistently provide any such value to Shaver.  Shaver

overpaid CAG over the life of the Amended Supply Agreement, because the

amounts Shaver paid were not commercially reasonable and were not

commensurate with the value that CAG provided.

CAG also caused Shaver a substantial loss of time and productivity relating

to its mishandling of a substantial order submitted by Elior.

Because it includes an unenforceable Non-Compete provision, the Amended

Supply Agreement is an illegal contract that is void and unenforceable under

Georgia law.  But should it be determined that the Amended Supply Agreement is enforceable, then Shaver seeks damages from CAG in an amount to be proven at trial due to (a) CAG's breach of the agreement, and (b) Shaver's overpayment of historical commissions to CAG.

There is also evidence that CAG misused Shaver's trade name and trademarks in an effort to improperly capitalize on Shaver's goodwill.  CAG had limited rights to use Shaver's name and trademark while the parties were operating under the Amended Supply Agreement.  But CAG's limited rights to use Shaver's name and trademark ended when Shaver terminated the Amended Supply Agreement on or about May 2, 2018.

Notwithstanding this, CAG continued to use the Shaver name and trademark – without Shaver's permission – in commerce.  For example, until as late as July 6, 2018 (two months after Shaver terminated the Amended Supply Agreement), CAG's own website impermissibly exploited Shaver's brand and goodwill by describing CAG as "CAG Shaver Foods."  Such commercial use of Shaver's name was a false or misleading description and/or representation of fact that is likely to cause confusion, mistake, or to deceive as to the affiliation, connection, or association of CAG with Shaver in violation of Section 43 (a) of the Lanham Act,

15 U.S.C. § 1125(a).  CAG's actions also constitute a violation of 15 U.S.C. § 1114 (trademark infringement).

**(4) Describe in detail all statutes, codes, regulations, legal principles, standards and customs or usages, and illustrative case law which defendant contends are applicable to this action.**

Because discovery has only just commenced, Shaver has not yet conducted an exhaustive review of the legal authority that is or may be relevant to the claims and defenses in this case.  With this caveat in mind, Shaver discloses the following legal authority based on the information presently available and the issues as Shaver understands them:

**General authority governing contract-based claims and counterclaims**

Paladino v. Avnet Computer Techs., Inc., 134 F.3d 1054, 1058 (11th Cir. 1998).

Tidikis v. Network for Med. Commnc's. & Research LLC, 274 Ga. App. 807, 810 (2005).

MASA Inc. v. ICG Keeprite Corp., No. 88 C 2133, 1990 WL 165306 (N.D. Ill. Oct. 24, 1990).

Comvest, LLC v. Corporate Securities Group, 234 Ga. App. 277 (1998).

Stover v. Candle Corp. of Am., 238 Ga. App. 657 (1999).

Salvatori Corp. v. Rubin, 159 Ga. App. 369, 373 (1981).

Charleston Lumber Co., Inc. v. Miller Housing Corp., 318 S.C. 471 (Ct. App. 1995).

Convoy Co. v. Sperry Rand Corp., 672 F.2d 781 (9th Cir. 1982).

Dunn Appraisal Co. v. Honeywell Info. Systems, Inc., 687 F.2d 877 (6th Cir. 1982).

Comdyne I, Inc. v. Corbin, 908 F.2d 1142 (3rd Cir. 1990).

United States v. CBS, Inc., 103 F.R.D. 365, 370-71 (C.D. Cal. 1984).

Stahl Mgmt. Corp. v. Conceptions Unlimited, 554 F. Supp. 890, 895 (S.D.N.Y. 1983).

O.C.G.A. § 13-4-4.

Golden Peanut Co. v. Neon Bass, 249 Ga. App. 224, 229 (2001).

Lowe Elec. Supply Co. v. Rexel, Inc., No. 5:14-CV-335 CAR, 2014 WL 5585857 (M.D. Ga. Nov. 3, 2014).

 Scott v. Ryder Truck Lines, Inc., 120 Ga. App. 819, 821 (1969).

St. Mary's Hosp. of Athens, Inc. v. Cohen, 216 Ga. App. 761, 762 (1995).

O.C.G.A. § 9-3-24.


**General authority related to defenses of waiver, laches, and estoppel**

Helms v. Franklin Builders, Inc., 305 Ga. App. 863, 866 (2010).

Cheek v. J. Allen Couch and Son Funeral Home, 125 Ga. App. 438, 447 (1972).

**General authority concerning restrictive covenants under Georgia law**

Advance Technology Consultants, Inc. v. Roadtrac, LLC, 250 Ga. App. 317, 320-321 (2001).

Carson v. Obor Holding Co., 318 Ga. App. 645, 649-50 (2012).

Waldeck v. Curtis 1000, Inc., 261 Ga. App. 590, 591-592 (2003).

Fine v. Commc'n Trends, Inc., 305 Ga. App. 298 (2010).

JR Construction/Electric, LLC v. Ordner Construction Co., 294 Ga. App. 453, 455 (2008).

Ameris Bancorp. v. Ackerman, 296 Ga. App. 295, 299 (2009).

HILB, Rogal & Hamilton Co. of Atlanta, Inc. v. Holley, 295 Ga. App. 54 (2008).

Smith Adcock & Co. v. Rosenbohm, 238 Ga. App. 281, 282-283 (1999).


**Authority relating to proof of damages and proximate cause**

Molly Pitcher Canning Co. v. Central of Georgia Railway Co., 149 Ga. App. 5, 10-11, 253 S.E.2d 392, 397 (1979).

Triad Drywall, LLC v. Bldg. Materials Wholesale, Inc., 300 Ga. App. 745, 747, 686 S.E.2d 364, 366 (2009).

KAR Printing, Inc. v. Pierce, 276 Ga. App. 511, 623 S.E.2d 704 (2005).

Hixson-Hopkins Autoplex, Inc. v. Custom Coaches, Inc., 208 Ga. App. 820, 432 S.E.2d 224 (1993).

Contract Furniture Refinishing & Maint. Corp. v. Remanufacturing & Design Group, LLC, 317 Ga. App. 47 (2012).

Coffee Butler Service, Inc. v. Sacha, 208 Ga. App. 4 (1993).

**Authority relating to Lanham Act claims and counterclaims**

15 U.S.C. § 1125(a)

15 U.S.C. § 1114

15 U.S.C. § 1117

U.S. v. Robbins, 819 F. Supp. 672 (E.D. Mich. 1993).

Ammon & Person v. Narragansett Dairy Co., 262 F 880 (1st Cir. 1919).

Coca-Cola Co. v. Cleo Syrup Corporation, 54 F. Supp. 665 (E.D. Mo. 1944).

Kason Industries, Inc. v. Component Hardware Group, Inc., 120 F.3d 1199 (11th Cir. 1997).

The Board of Regents of the University System of Georgia v. Buzas Baseball, Inc., 176 F. Supp. 2d 1338 (N.D. Ga. 2001).

The University of Alabama Board of Trustees v. New Life Art, Inc., 683 F.3d 1266 (11th Cir. 2012).

Other general case law on the defenses of fair use, estoppel, waiver, and laches and its applicability to the Lanham Act.

**Authority relevant to attorney's fees claim**

O.C.G.A. § 13-6-11

Jeff Goolsby Homes Corp. v. Smith, 168 Ga. App. 218 (1993).

(5)     Provide the name and, if known, the address and telephone number of each individual likely to have discoverable information that you may use to support your claims or defenses, unless solely for impeachment, identifying the subjects of the information.  (Attach witness list to Initial Disclosures as Attachment A.)

**Disclosure:**

*See* Attachment A.

(6)     Provide the name of any person who may be used at trial to present evidence under Rules 702, 703, or 705 of the Federal Rules of Evidence. For all experts described in Fed. R. Civ. P. 26(a)(2)(B), provide a separate written report satisfying the provisions of that rule. (Attach expert witness list and written reports to Responses to Initial Disclosures as Attachment B.)

**Disclosure:**

Shaver has not identified a trial expert.  Once Shaver identifies any such experts, Shaver will identify them pursuant to Fed. R. Civ. Proc. 26, Local Rule 26.2(C), and/or any Scheduling Order entered in this matter.

(7)     Provide a copy of, or a description by category and location of, all documents, data compilations or other electronically stored information, and tangible things in your possession, custody, or control that you may use to support your claims or defenses unless solely for impeachment, identifying the subjects of the information. (Attach document list and descriptions to Initial Disclosures as Attachment C.)

**Disclosure**

*See* Attachment C.

(8)     In the space provided below, provide a computation of any category of damages claimed by you. In addition, include a copy of, or describe by category and location of, the documents or other evidentiary material, not privileged or protected from disclosure, on which such computation is based, including materials bearing on the nature and extent of injuries suffered, making such documents or evidentiary material available for inspection and copying as under Fed. R. Civ. P. 34. (Attach any copies and descriptions to Initial Disclosures as Attachment D.)

**Disclosure:**

*See* Attachment D.

**(9) If defendant contends that some other person or legal entity is, in whole or in part, liable to the plaintiff or defendant in this matter, state the full name, address, and telephone number of such person or entity and describe in detail the basis of such liability.**

<u>**Disclosure**</u>:

None.

(10)    Attach for inspection and copying as under Fed. R. Civ. P. 34 any insurance agreement under which any person carrying on an insurance business may be liable to satisfy part or all of a judgment which may be entered in this action or to indemnify or reimburse for payments made to satisfy the judgment. (Attach copy of insurance agreement to Initial Disclosures as Attachment E.)

**Disclosure:**

N/A.

Respectfully submitted this 9th day of April, 2019.


*Matthew B. Ames*

Matthew Ames
Georgia Bar Number 015898
James Williams, Jr.
Georgia Bar No. 812411
jwilliams@balch.com

**Balch & Bingham LLP**
30 Ivan Allen Jr. Boulevard, N.W.
Suite 700
Atlanta, Georgia 30308
Telephone: (404) 261-6020
Facsimile: (404) 261-3656
mames@balch.com
jwilliams@balch.com

*Attorney for Defendant Shaver Foods,*
*LLC*

## ATTACHMENT A

The following individuals may have information relevant to this action:

1.     Mr. Ashley White.   Owner and Chief Executive Officer of Shaver. Mr. White has knowledge of the matters asserted in Plaintiff's Amended Complaint and Shaver's Answer and Counterclaims.   Mr. White may be contacted through counsel.

2.     Mr. Rich Adams.  Co-owner of Plaintiff CAG Food Services.   Mr. Adams is believed to have knowledge of the matters asserted in Plaintiff's Amended Complaint and Shaver's Answer and Counterclaims.

3.     Mr. William T ("W.T.") Ross.  Co-owner of Plaintiff CAG Food Services.   Mr. Adams is believed to have knowledge of the matters asserted in Plaintiff's Amended Complaint and Shaver's Answer and Counterclaims.

4.     Jim Everett, retired from Elior, Inc.   Shaver presumes that Mr. Everett may be contacted through Elior's counsel.  Mr. Everett can attest to the relationship between Shaver and Elior.  It is believed Mr. Everett can also provide insight into the relationship between CAG and Elior and the actions of CAG after being terminated.

5.      Fred Botero, VP of purchasing at Trinity.   Mr. Botero can attest to the relationship between Shaver and Trinity.

6.      Scott Wales, former Director or Sales at Shaver Foods, LLC.   Mr. Swales can attest to the nature of Shaver Foods' customers and business before and during Shaver's relationship with CAG, provide insight into the formation of the supply agreement and what was represented by CAG, and interactions between CAG and Shaver Foods and between CAG and Shaver Foods' customers while he was employed by Shaver Foods, LLC.

7.      Rebecca Waites, former Sales Manager at Shaver Foods, LLC.   Ms. Waites can attest to interactions between CAG and Shaver Foods and between CAG and Shaver Foods' customers while she was employed by Shaver Foods, LLC.

8.      Jereb Mounce, former Director of Sales at Shaver Foods, LLC.   Mr. Mounce can attest to interactions between CAG and Shaver Foods and between CAG and Shaver Foods' customers while he was employed by Shaver Foods, LLC.

9.      John Dorman, Director of Sales and Purchasing at Shaver Foods, LLC.   Mr. Dorman can attest to interactions between CAG and Shaver

Foods and between CAG and Shaver Foods' customers while employed by Shaver Foods, LLC.  He can also provide insights into the events that lead to the termination of the CAG relationship between CAG and Shaver Foods, LLC.

10.    Michelle Tull, former Sales Manager at Shaver Foods, LLC.  Ms. Tull can attest to interactions between CAG and Shaver Foods and between CAG and Shaver Foods' customers while she was employed by Shaver Foods, LLC.

11.    Marlin Sejnoha, Elior, Inc.   Shaver presumes that Mr. Sejnoha may be contacted through Elior's counsel.   Mr. Sejnoha can attest to the relationship between Shaver and Elior.  It is believed Mr. Sejnoha can also provide insight into the relationship between CAG and Elior and the actions of CAG after being terminated.

12.    Jenny Mercuriev, former employee at CAG. It is believed that Ms. Mercuriev can provide insight into how CAG represented itself and operated.

Shaver reserves the right to amend this disclosure as additional information surfaces during discovery.

## **ATTACHMENT B**

Shaver has not yet retained any expert witnesses in either a consultative capacity or for purposes of testifying at trial.  Shaver reserves the right to amend this disclosure.

# ATTACHMENT C

Shaver identifies the following categories of documents and electronically stored information that are or may be relevant to this case:

1.      The Original Supply Agreement and the Amended Supply Agreement.

2.      Documents, including emails, that show the negotiations and discussions that led to the execution of the Original Supply Agreement and the Amended Supply Agreement.

3.      Documents that show Shaver's payments to CAG over the six (6) years that preceded the termination of the Amended Supply Agreement.

4.      The "Client Contracts" referenced in Paragraph 7 of the Amended Complaint and any related correspondence.

5.      Correspondence between CAG and Shaver that relates to (i) CAG's performance under the Amended Supply Agreement; (ii) adjustments to the percentages to be paid to CAG under the Amended Supply Agreement; and/or (iii) the possibility of revisiting the terms of the Amended Supply Agreement.

6.      Correspondence between CAG and Shaver that relates to any of the disputed issues in the case.

7.      All documents showing CAG's use of Shaver's name or trade mark after Shaver's termination of the Amended Supply Agreement.

8.     All documents between CAG (including texts and emails) between CAG and any entity that CAG contends is a "CAG Client" subsequent to Shaver's termination of the Amended Supply Agreement.

9.     Copies of all contracts that CAG contends support or relate to its alleged damages in this case.

10.     All documents that evidence or relate to CAG's alleged damages in any respect.

11.     Any and all documents evidencing CAG's efforts to mitigate its alleged damages (if any).

## **ATTACHMENT D**

Shaver is still compiling information as it relates to its damages and will supplement this information.

## **ATTACHMENT E**

None at this time.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on April 9, 2019, a true and correct copy of Defendant's Initial Disclosures was filed via the CM/ECF system, which will automatically notify all counsel of record.

/s/ Matthew B. Ames
Matthew B. Ames
Georgia Bar Number 015898