IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

CAG FOOD SERVICES, LLC, f/k/a
CORRECTIONAL ADVISOR'S GROUP, LLC,

  Plaintiff,

  v.

SHAVER FOODS, LLC,

  Defendant.

Civil Action No.
1:18-cv-02753-SDG

**OPINION AND ORDER**

This matter is before the Court on Plaintiff's Motion for Partial Summary Judgment [ECF 68]. For the reasons stated below, the Court **GRANTS IN PART AND DENIES IN PART** Plaintiff's motion.

**I.   Background**

Unless otherwise noted, the following facts are not disputed by the parties or are supported by undisputed evidence in the record. Plaintiff CAG Food Services, LLC, f/k/a Correctional Advisor's Group, LLC (CAG) and Defendant Shaver Foods, LLC (Shaver) entered into a Supply Agreement in 2007.[1] The parties signed an Amended Supply Agreement (ASA) in 2008.[2] Under the ASA, Shaver

---

1   ECF 22-1.

2   *Id.*; ECF 22-2.

agreed to be the primary supplier of food services to CAG's clients.[3] In exchange, CAG received 5% of the total amount paid on those invoices.[4] The ASA also allowed for the possibility that the parties could tailor their agreements for specific clients by entering into a separate supply agreement that would supersede the ASA.[5]

On May 2, 2018, Ashley White, President and CEO of Shaver, sent an email to CAG purporting to terminate the ASA.[6] The email states that Shaver is terminating the current arrangement "effective immediately" because it is no longer profitable.[7] It goes on to state:

> CAG is due a check for April 2018, based on the arrangements prior to this notification, and that will be paid. Because it is the end of the program, we need to make sure all credits, debits, and sales adjustments are processed since they all effect the final payment. When

---

[3] ECF 22-2.

[4] *Id.* ("In exchange [CAG] will receive a commission of 5% of the total amount paid for each future invoice by a client managed by [CAG] within the purview of this supply agreement.").

[5] *Id.* ("This agreement is meant to serve as a framework agreement for most facilities. However, [CAG] and [Shaver] recognize the need to tailor separate supply agreements for some clients based on various circumstances to be determined as they arise. In such cases, those agreements will supersede this agreement for the client in question with respect to the area of the separate agreement that is in conflict with this supply agreement.").

[6] ECF 68-2.

[7] *Id.*

> the program was active and ongoing, such things were captured by the rolling nature of the transactions, but starting or stopping the program requires that all transactions that are pending be entered and updated so they are reflected in the final check. I will make sure this is dealt with quickly so it does not delay your payment. If you would like me to send part of the payment and hold back a reserve to deal with adjustments, etc…I am certainly willing to do so.[8]

Despite White's acknowledgment that Shaver still owed a "final payment" to CAG for sales through April 2018, Shaver never paid CAG its April commissions.[9]

CAG claims Shaver still owes CAG 5% commissions on all April 2018 invoices and some invoices from the end of March 2018, totaling $168,766.42.[10] Shaver disputes that it owes CAG anything and, to the extent it does, it disputes the amount claimed.[11]

---

[8]   *Id.*

[9]   ECF 68-3, ¶¶ 7–9.

[10]  *Id.* ¶¶ 7–8.

[11]  ECF 71-1, ¶¶ 7–9.

## II. Procedural History

On May 16, 2018, CAG filed this action in the Superior Court of Cobb County.[12] On June 5, 2018, Shaver removed the case to this Court.[13] CAG amended its pleading on July 3, 2018.[14]

The Amended Complaint asserts the following claims: Count I: breach of contract for March 2018 commissions; (2) Count II: breach of contract for April 2018 commissions; (3) Count III: breach of contract for commissions from May 2018 onward; (4) Count IV: unjust enrichment, argued in the alternative; Count V: tortious interference with contractual and business relations; Count VI: unfair competition under the Lanham Act, 15 U.S.C. § 1125(a)(1)(A); Count VII: attorneys' fees and expenses; Count VIII: breach of covenant of good faith and fair dealing.[15] Shaver moved to dismiss Count I, III, IV, V, VI, and VIII of the Amended

---

[12] ECF 1-1.

[13] ECF 1.

[14] ECF 22.

[15] Due to a typographical error in the Amended Complaint, the good faith and fair dealing count is listed as Count VIII and the attorneys' fees count is listed as Count VII. ECF 22.

Complaint.[16] The Court granted the motion as to Counts III and V and denied the motion as to the remaining counts.[17]

On May 2, 2019, Shaver filed its Answer, Affirmative Defenses, and Counterclaims to the Amended Complaint.[18] Shaver's counterclaims assert the following: Count I: breach of contract, contingent on the Court's finding that the ASA is an enforceable contract; Count II: trademark infringement and false designation of origin; and, Count III: attorneys' fees.[19] CAG moved to dismiss Counts I and III of the Counterclaim for failure to state a claim.[20] The Court granted CAG's motion as to Count I and denied it as moot as to Count III based on Shaver's preemptive withdrawal of that claim.[21]

---

[16] ECF 24.

[17] ECF 31.

[18] ECF 33.

[19] *Id.* at 19–33.

[20] ECF 41.

[21] ECF 88. The parties have also jointly stipulated to dismiss, with prejudice, Count VI of CAG's Amended Complaint and Count II of Shaver's counterclaim. ECF 101. Accordingly, there are no remaining counterclaims.

Prior to the Court ruling on CAG's motion to dismiss Shaver's counterclaims, CAG filed the present motion for partial summary judgment as to Count II of the Amended Complaint.[22]

### III. Summary Judgment

#### a. Legal Standard

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it can affect the outcome of the lawsuit under the governing legal principles. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "genuine . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

A party seeking summary judgment has the burden of informing the district court of the basis for its motion and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If a movant meets its burden, the party opposing summary judgment must present evidence showing either (1) a genuine issue of material fact or (2) that the movant is not entitled to judgment as a matter of law. *Id.* at 324.

---

[22] ECF 68.

In determining whether a genuine issue of material fact exists, the evidence is viewed in the light most favorable to the party opposing summary judgment, "and all justifiable inferences are to be drawn" in favor of that party. *Anderson*, 477 U.S. at 255; *see also Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1246 (11th Cir. 1999). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions," and cannot be made by the district court. *Anderson*, 477 U.S. at 255. *See also Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999). Summary judgment for the moving party is proper "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

**b.    Discussion**

Both parties assert that Georgia law controls this action. In Georgia, "[t]he essential elements of a breach of contract claim are (1) a valid contract; (2) material breach of its terms; and (3) damages arising therefrom." *Brooks v. Branch Banking & Tr. Co.*, 107 F. Supp. 3d 1290, 1295 (N.D. Ga. 2015). CAG argues that the evidence shows that a valid contract existed between the parties, that a material term of that contract was the payment of commissions, that Shaver failed to pay CAG its April

commissions, and that CAG was harmed therefrom in the amount of the commissions owed plus interest.[23]

In response, Shaver does not dispute the existence of a valid contract or its breach. Rather, it argues that it does not owe CAG for the April 2018 commissions because: (1) the ASA only requires payment to CAG for clients "managed by" CAG and CAG either breached the ASA or failed to comply with a condition precedent to its payment when it did not perform those management services; (2) CAG's claim is barred by its prior breach of the ASA relating to Shaver's customer, Elior;[24] (3) the amount claimed by CAG is wrong; (4) the amount should be reduced by payments CAG received in a purportedly related action between CAG and Elior.[25]

For the reasons stated below, the Court finds that the evidence does not support Shaver's claim that CAG failed to comply with a condition precedent under the ASA or breached the ASA. Therefore, Shaver's breach is not excused. However, the Court finds that Shaver has presented evidence of a genuine dispute of material fact regarding CAG's calculation for damages. As such, the Court

---

[23]   ECF 68-1, at 4–5.

[24]   ECF 71.

[25]   *Id.*

**GRANTS** the motion for summary judgment on Count II as to liability and **DENIES** the motion as to damages.

### *i.* **Liability**

As a preliminary matter, the Court finds that CAG has presented evidence to support each requirement of its breach of contract claim under Georgia law. CAG provided a copy of the ASA, showing that the parties entered into a contract.[26] Under the contract, absent a superseding agreement tailored to a specific client, Shaver was required to pay CAG a 5% commission on sales to CAG's clients.[27] As acknowledged by White, Shaver owed CAG April 2018 commissions.[28] However, Shaver has never paid CAG for those commissions.[29] Accordingly, CAG has shown that Shaver materially breached the ASA.

Shaver does not dispute the above. Rather, Shaver argues that it is not liable for its breach of the ASA because CAG either failed to perform a condition precedent or committed its own breach of the ASA prior to Shaver's breach. The Court addresses each in turn.

---

[26]   ECF 22-2.

[27]   *Id.*

[28]   ECF 68-2 ("CAG is due a check for April 2018, based on the arrangements prior to this notification, and that will be paid.").

[29]   ECF 68-3, ¶¶ 5–9; ECF 68-4.

The Court rejects Shaver's claim that CAG failed to satisfy a condition precedent purportedly established under the ASA's "managed by" language or otherwise breached the ASA by not providing management services.[30] As explained in the Court's Order dismissing Shaver's breach of contract claim, Shaver's argument improperly attempts to read into the contract certain management services to be performed by CAG that are contrary to the plain language of the contract and the contract as a whole.[31] Since CAG was not required to provide management services for Shaver, CAG's failure to do so does not excuse Shaver's breach.

Shaver's contention that, "at the very least, a question of fact is presented as to the question of whether (as Shaver contends) the [ASA] required the performance of an actual service on CAG's part," is unavailing.[32] The ASA shows that CAG's role under the ASA was to bring in business for Shaver by directing CAG's clients to Shaver.[33] This is supported by Shaver's own testimony regarding

---

[30] ECF 71, at 11.

[31] *See* ECF 88, at 10–13.

[32] ECF 71, at 12.

[33] ECF 22-2 ("[Shaver] will be the primary supplier of all foodservice food and food related products . . . to clients managed by [CAG] . . . In exchange [CAG] will receive a commission of 5% . . . .").

its reasoning for entering into the ASA. In White's declaration, he states the following:

> A chief assumption underlying the negotiation and execution of the amended Supply Agreement was the notion that CAG would introduce Shaver's model to new clients and generate new business for Shaver through existing customers where CAG could leverage their credibility and relationships with corporate officers. When Shaver entered into the [ASA] with CAG, Shaver believed that the principals of CAG (Rich Adams and W.T. Ross) had a meaningful understanding of correctional food service, a network of relationships created through years of industry work, and the trust of many people who had worked with them through the years that would grow Shaver's sales.
>
> …
>
> CAG was brought in principally because its principals (Rich Adams and W.T. Ross) had extensive contacts in the industry, but over time, it became obvious that CAG had few contacts left as the industry consolidated and many of CAG's contacts began to retire or otherwise left the industry.[34]

It is undisputed that CAG brought in new clients and increased sales from its clients who had previously worked with Shaver.[35] Thus, it is undisputed that CAG performed "an actual service" under the ASA.

---

[34]   ECF 71-2, ¶¶ 7, 10.

[35]   *Id.* ¶ 8.

The Court also rejects Shaver's argument that CAG's claims are barred by its prior breach of the ASA through its alleged mishandling of the Elior order. As a preliminary matter, Shaver has not shown that CAG breached the ASA in its handling of the Elior order.[36] Moreover, the Court finds that even if CAG had breached the ASA, Shaver waived the breach by continuing under the contract. "A party's right to pursue remedies for breach must be asserted promptly." *Clower v. Orthalliance, Inc.*, 337 F. Supp. 2d 1322, 1331 (N.D. Ga. 2004) (citing *Crawford v. Etheridge*, 248 Ga. App. 429, 432 (2001)). "At the point of breach, a party may continue the contract or refuse to perform." *Id.* (citing *Southern Sav. Bank v. Dickey*, 58 Ga. App. 718, 722 (1938) and 13 Williston on Contracts § 39.32 (4th ed. 2003)). The non-breaching party terminates its right to refuse to perform under the contract if it continues to perform and receive benefits under the contract after it learns of the breach. *Id.*

According to Shaver, the alleged mishandling of the Elior order occurred in mid-2017.[37] However, Shaver continued to perform under the contract and did not

---

[36] *See* ECF 88, at 12–14 (finding that Shaver failed to sufficiently allege that CAG's handling of the Elior order breached a term of the ASA).

[37] ECF 71-1, ¶ 12.

terminate it until May 2, 2018.[38] As such, even if CAG had breached the ASA in its handling of the Elior order, Shaver waived the right to stop payments on account of this breach.

Since it is undisputed that Shaver committed a breach of the ASA and there was no condition precedent or prior breach that could excuse Shaver's conduct, the Court finds that Shaver is liable for the April 2018 commissions under Count II of the Amended Complaint.

### ii. Damages

CAG calculated the amount it is allegedly owed from Shaver's breach by applying a 5% commission to Shaver's April 2018 invoices from CAG's clients.[39] However, Shaver argues that CAG's calculation was incorrect for multiple reasons.

First, Shaver argues that the ASA allowed the parties to modify the ASA's terms with regard to specific clients.[40] Shaver provided evidence that the parties

---

[38] *Id.* ¶ 7; ECF 68-2, at 2.

[39] ECF 68-6, ¶ 3; ECF 68-7.

[40] ECF 71, at 3; *see* ECF 22-2 ("[CAG] and [Shaver] recognize the need to tailor separate supply agreements for some clients based on various circumstances to be determined as they arise. In such cases, those agreements will supersede this agreement for the client in question with respect to the area of the separate agreement that is in conflict with this supply agreement.").

modified the 5% commission rate with regard to at least some clients in the form of emails between the parties discussing the adjustments for Trinity, A'viands, Summit, and Aladdin.[41] CAG denies that the commission rates were permanently altered for any clients, or that any such clients were included in its damages calculation.[42] However, contrary to CAG's assertion, three of those clients are included in the table outlining its commission calculation.[43] Accordingly, Shaver has raised a dispute of material fact regarding whether CAG accurately calculated the damages to be awarded through its blanket use of the 5% commission rate.

Second, Shaver argues that CAG's calculation is incorrect because it does not account for credits, debits, and sales adjustments or negative transactions.[44] Shaver alleges that there are at least 46 negative transactions from April 2018.[45] CAG did not respond to this argument; it has not provided any evidence disputing that such adjustments must be considered or claiming that they were properly

---

[41] ECF 71-2, ¶¶ 20–21 (citing ECF 71-4 and ECF 71-5).

[42] ECF 75, ¶ 6 (citing ECF 68-7 and ECF 68-6).

[43] *See* ECF 68-7 (listing invoices from Trinity, Summit, and Aladdin).

[44] ECF 71 (citing ECF 71-2, ¶ 24). The necessity to account for these adjustments is also supported by White's May 2, 2018 email that notes: "Because it is the end of the program, we need to make sure all credits, debits and sales adjustments are processed since they all effect the final payment." ECF 68-2.

[45] ECF 71-2, ¶ 24.

considered in its calculation. Therefore, Shaver has raised a dispute of material fact as to the accuracy of CAG's calculation to the extent it does not consider such adjustments.

Third, Shaver argues that the award must be offset by a Settlement Agreement entered into by Elior and CAG stemming from CAG's breach of contract action against Elior.[46] However, the Complaint filed in that action (provided to the Court by both parties),[47] shows that CAG's action against Elior was for breaches occurring after July 2, 2018.[48] Accordingly, such damages could not offset Shaver's non-payment of CAG's April 2018 commissions under Count II.

While the Elior settlement agreement is inapplicable to the damages calculation, Shaver's arguments that the 5% commission was improperly applied across the board and that CAG failed to consider appropriate adjustments raises genuine issues of material fact as to the accuracy of CAG's damages calculation.

---

[46] ECF 71, at 16–17; *see* ECF 72-1 (filed under seal).

[47] *See* ECF 71-8 and ECF 74.

[48] Compl., *CAG Food Services, LLC v. Elior, Inc.*, No. 1:19-CV-00791-WMR (N.D. Ga. Feb. 14, 2019), ECF 1, ¶ 46.

Consequently, the Court **DENIES** summary judgment on the issue of damages under Count II of the Amended Complaint.

## IV. Conclusion

The Court **GRANTS IN PART AND DENIES IN PART** CAG's motion for partial summary judgment on Count II of the Amended Complaint [ECF 68]. The Court **GRANTS** the motion as to Shaver's liability and **DENIES** the motion as to damages.

Counts I, IV, V, VII, and VIII remain pending in this litigation, as does Shaver's motion for summary judgment on those counts. The Court **STAYS** further adjudication on the issue of damages to be awarded under Count II until it rules on Shaver's motion for summary judgment.

**SO ORDERED** this the 24th day of September 2020.

Steven D. Grimberg
United States District Court Judge